UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK M. ZANECKI, personal representative
of the Estate of Richard Zanecki, deceased,

   Plaintiff,       Case No. 12-13234

v.

            District Judge Nancy G. Edmunds
            Magistrate Judge Laurie J. Michelson

HEALTH ALLIANCE PLAN OF DETROIT d/b/a/
HAP SENIOR PLUS and
UNITED STATES OF AMERICA,

   Defendants.

_____/

**REPORT AND RECOMMENDATION TO**
**GRANT HEALTH ALLIANCE PLAN'S MOTION TO DISMISS [32], TO**
**GRANT THE UNITED STATES' MOTION TO DISMISS [34], AND TO**
**DENY AS MOOT HEALTH ALLIANCE PLAN'S MOTION TO PRECLUDE**
**UNAUTHORIZED PRACTICE OF LAW [48]**

  In 2007, Richard Zanecki suffered a stroke and was taken to the hospital. Treatment included a surgery that placed a Boston Scientific Wingspan Stent in one of Richard Zanecki's cerebral arteries. A few days later, Richard Zanecki died from a perforated cerebral artery.

  This is the third suit filed by Richard Zanecki's estate seeking to recover damages arising out of his medical treatment. The first settled, and the second was dismissed. Here, Plaintiff Mark Zanecki, Richard's son and the personal representative of his estate, sued Health Alliance Plan of Detroit ("HAP") alleging that HAP, which provided Medicare benefits to Richard Zanecki, contributed to his father's death by, among other things, approving the wingspan stent procedure as a Medicare-covered benefit despite a contrary National Coverage Decision issued by the Centers for Medicare & Medicaid Services. (Dkt. 31, Am. Compl. ¶¶ 423-24.) The United States is a

defendant because Plaintiff claims that HAP, by administrating Medicare benefits, acted as an arm of the Centers for Medicare & Medicaid Services, an agency within the United States Department of Health and Human Services.  (Am. Compl. ¶¶ 193-95.)

Both the United States and HAP have moved to dismiss this case; they primarily claim that the federal court lacks jurisdiction over the claims alleged.  (*See generally* Dkt. 32, HAP's Mot. to Dismiss; Dkt. 34, Govt.'s Mot. to Dismiss.)  Plaintiff has responded to both motions.  (Dkt. 44, Pl.'s Resp. to Mots. to Dismiss.)  This Court has reviewed the briefs and heard oral argument.  Having been so informed, this Court concludes that Plaintiff has brought this suit pursuant to the Federal Tort Claims Act, but HAP is not a proper defendant to such an action and Plaintiff has not sufficiently pled that HAP is an "employee of the Government" such that the United States would be subject to suit under the Act.  Accordingly, this Court RECOMMENDS that Plaintiff's Amended Complaint be DISMISSED for lack of subject-matter jurisdiction.

## I.

Despite that the Federal Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8, Plaintiff has filed a 433-paragraph, 200-page Amended Complaint (Dkt. 31).  What follows is much briefer and suffices to resolve the pending motions.

## A.

On September 28, 2007, Richard Zanecki, then 82 years old, suffered a minor transient ischemic attack (Am. Compl. ¶ 55), i.e., blood did not flow to part of his brain for a brief period. He was admitted to St. Joseph Mercy Oakland Hospital by his treating physician, Dr. Zafarullah Muhammad.  (Am. Compl. ¶¶ 126, 133.)

2

Plaintiff implies that by the next morning, his father was doing relatively well: Richard was awake and alert, had a strong grasp, had "very little" droop on the left side of his face, and "was conversing about sports and news events." (Am. Compl. ¶ 134.)  Nonetheless, says Plaintiff, Dr. Muhammad, along with a surgeon, Dr. John Whapham, planned for Richard Zanecki to undergo an angiogram with a possible angioplasty and wingspan stent placement. (Am. Compl. ¶ 139; *see also id.* ¶ 135.) Plaintiff says, "[g]iven that Richard was clinically stable, improving, and asymptomatic, and had never displayed any symptoms on his right side, it was absolutely medically unnecessary and wrong for Dr. Muhammad, HAP and Dr. Whapham to plan a balloon angioplasty with wingspan stent on a left brain stenosis." (Am. Compl. ¶ 136.) Plaintiff also alleges that Dr. Whapham was operating under a conflict of interest that made him "anxious to perform the balloon angioplasty and Wingspan Stent [procedure] . . . on a patient for whom the procedure was totally unwarranted." (*Id.*)

In the early morning of September 30, 2007, Dr. Whapham, along with another physician, Richard Fessler, placed a Boston Scientific Wingspan Stent ("Wingspan Stent") in Richard Zanecki's left-middle cerebral artery. (Am. Compl. ¶¶ 140, 175, Ex. 18, Coroner's Rep., Ex. 53, Operating Rep.) Once deployed inside a clogged or narrowed artery, the sheath-like stent expands to allow blood to more easily flow through the artery. (*See* Am. Compl. ¶ 143.)

On October 3, 2007, Richard Zanecki died. (Am. Compl. ¶ 183.) The coroner's report provides that the cause of death was a "perforated left middle cerebral artery and complications thereof due to status post angiography and stent placement procedure." (Am. Compl. Ex. 18.)

**B.**

About two years after Richard Zanecki died, in November 2009, Richard Zanecki's estate brought a medical malpractice suit in state court against Drs. Muhammad, Whapham, and Fessler,

University Neurological Associates (Drs. Whapham and Fessler's employer), and St. Joseph Mercy Oakland asserting that they, among other things, committed medical malpractice and failed to obtain adequate informed consent before performing the Wingspan Stent procedure. (*See* Am. Compl. Ex. 28, Oakland County Cir. Ct. Compl.)  The case resulted in a monetary settlement. (Am. Compl. Ex. 20.)

In July 2012, Plaintiff filed a suit in this judicial district against two institutional review boards: Henry Ford Health System Institutional Review Board #1 and St. Joseph Mercy Oakland Hospital – Trinity Health System Institutional Review Board #1. *Zanecki v. Henry Ford Health Sys. IRB #1 et al.*, No. 12-13233 (E.D. Mich. filed July 23, 2012).  Pursuant to 42 U.S.C. § 1983, Plaintiff alleged that the Food and Drug Administration had approved the Wingspan Stent only under a limited "humanitarian device exemption," and, under that exemption, absent an emergency situation, an institutional review board was required to approve the use of the device.  *See Zanecki v. Henry Ford Health Sys. IRB #1 et al.*, No. 12-13233, 2013 WL 992665, at *2 (E.D. Mich. Jan. 17, 2013), *report and recommendation adopted in part, rejected in part*, 2013 WL 992635 (E.D. Mich. Mar. 13, 2013).  Plaintiff believed that the two defendant IRBs wrongly approved use of the Wingspan Stent, which enabled the stent to be procured by St. Joseph Mercy Oakland and, ultimately, used in the surgery that led to his father's death.  *Id.*  This Court concluded, among other things, that Plaintiff's § 1983 claims against the IRBs were time-barred.  *Id.* at *12.  District Judge Nancy G. Edmunds agreed and dismissed the case.  *Zanecki v. Henry Ford Health Sys. IRB #1 et al.*, No. 12-13233, 2013 WL 992635 (E.D. Mich. Mar. 13, 2013), *motion for relief from judgment denied*, 2013 WL 1811318 (E.D. Mich. Apr. 30, 2013).

4

## C.

In this action, Plaintiff has sued Health Alliance Plan of Detroit and the United States of America. To better understand HAP's relationship to Richard Zanecki and the United States, and to better grasp Plaintiff's myriad allegations, it is necessary to review the basic structure of the Medicare system.

Congress established Medicare in 1965 to provide federally-funded medical insurance for the elderly and disabled. *Minnesota ex rel. Hatch v. United States*, 102 F. Supp. 2d 1115, 1116 (D. Minn. 2000), *aff'd*, 273 F.3d 805 (8th Cir. 2001). The Secretary of the United States Department of Health and Human Services administers Medicare through the Centers for Medicare & Medicaid Services ("CMS"), which, as noted, is an agency within the Department. *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 63 (D.D.C. 2010).

The Medicare program was initially divided into two parts: Part A and Part B. *Minnesota ex rel. Hatch*, 102 F. Supp. 2d at 1116. Part A covers "hospital insurance, including inpatient hospital care, skilled nursing facility care, home health agency care, and hospice care." *Id.* Part B provides supplemental medical insurance for "physician services, laboratory and diagnostic tests, durable medical equipment, medical supplies, ambulance services, and prescription drugs that cannot be self-administered." *Id.* at 1117.

Prior to 2003, through contracts with the Secretary, Medicare Part A was administered by organizations known as "fiscal intermediaries" and Medicare Part B was administered by organizations known as "carriers." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 706 (10th Cir. 2006). As a result of the Medicare Modernization Act of 2003, these obligations are now undertaken by entities known as Medicare Administrative Contractors. *Nichole*

*Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 342 (3d Cir. 2012).  The Medicare Act provides that the Secretary can contract with a Medicare Administrative Contractor for the performance of "any or all of the functions" described in 42 U.S.C. § 1395kk-1(a)(4).  42 U.S.C. § 1395kk-1(a)(1).  These functions include "[d]etermining . . . the amount of the payments required . . . to be made to providers of services, suppliers and individuals," making those payments, "[c]ommunicating to providers . . . any information or instructions furnished to the medicare administrative contractor by the Secretary," and performing other functions "necessary to carry out the purposes" of the Act.  42 U.S.C. § 1395kk-1(a)(4).  With certain limitations for criminal, fraudulent, or grossly negligent conduct, the Secretary may also agree to indemnify a Medicare Administrative Contractor for legal claims "arising from or relating directly to the claims administration process."  42 U.S.C. § 1395kk-1(d)(4)(A).

In 1972, Congress enacted Medicare Part C, formerly known as the "Medicare+Choice" program and now known as the "Medicare Advantage Program."  *See Minnesota Senior Fed'n*, 273 F.3d at 807; *First Med. Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 48 & n.1 (1st Cir. 2007).  The Medicare Advantage Program provides an alternative to Medicare Parts A and B: it allows Medicare-qualifying individuals to receive their Part A and B benefits from private insurers that contract with CMS.  *Meek-Horton v. Trover Solutions, Inc.*, No. 11-6054, 2013 WL 25888, at *2 (S.D.N.Y. Jan. 2, 2013); *Allina Health Servs.*, 756 F. Supp. 2d at 64.  These Part C contractors are known as Medicare Advantage Organizations ("MAOs").  *Meek-Horton*, 2013 WL 25888, at *2; *Allina Health Servs.*, 756 F. Supp. 2d at 64.  The regulations provide that an MAO is "a public or private entity organized and licensed by a State as a risk-bearing entity (with the exception of provider-sponsored organizations receiving waivers) that is certified by CMS as meeting the MA

6

contract requirements."  42 C.F.R. § 422.2.

Importantly, for individuals that receive their Medicare benefits by enrolling with an MAO, CMS does not directly pay the enrollee's Medicare provider (e.g., a hospital) for the services provided to the enrollee.  *Allina Health Servs.*, 756 F. Supp. 2d at 64.  Instead, CMS pays the MAO a fixed, monthly amount for its enrollees, and MAOs contract with Medicare providers for the provision of services to those enrollees.  *Id.*; *see also Meek-Horton*, 2013 WL 25888, at *2.  Thus, MAOs bear the risk of erroneous coverage decisions.  If the MAO pays for a costly procedure not covered by Medicare, then likely it will not recoup its expenditures from CMS's fixed, pre-determined payments.  On the other hand, if the MAO denies an enrollee payment for a procedure that is covered by Medicare, the MAO may be subjected to the time and expense of an appeal by the enrollee, and, ultimately, may have to render a benefit payment.  *See Giesse v. Sec'y of Dep't of Health & Human Servs.*, 522 F.3d 697, 703 (6th Cir. 2008) (detailing appeals process).

With this background in mind, the parties' relationships are readily discernable.  Defendant HAP is a Michigan health maintenance organization that has contracted with CMS to serve as a Medicare Advantage Organization.  (Am. Compl. ¶ 18; *see also id.* ¶ 17.)  Richard Zanecki was enrolled in HAP's Medicare Advantage plan, "HAP Senior Choice," from January 1, 2007 until his death in October 2007.  (Am. Compl. ¶ 35.)  Non-party St. Joseph Mercy Oakland Hospital contracted with HAP to be a Medicare provider.  (Am. Compl. ¶¶ 19, 22.)  As noted, Plaintiff has named the United States as a defendant because he believes that, as a Medicare Advantage Organization, HAP acted as an arm of CMS.  (Am. Compl. ¶¶ 193-95.)

**D.**

Plaintiff alleges that HAP, and therefore the United States, committed a number of wrongful acts. The Court does not endeavor to recount each of them. The following is representative.

Plaintiff asserts that HAP had a duty to warn Richard Zanecki of the risks, dangers, and "lack of medical effectiveness" of the Wingspan Stent because of the doctor-patient relationship between "HAP physician" Dr. Muhammad and Richard Zanecki. Yet, says Plaintiff, "[n]owhere in the medical transcript or medical records are any warnings, dangers, lack of medical effectiveness or Wingspan [S]tent classified as experimental/investigational found. The Boston Scientific Wingspan informational packet was never given to Richard M. Zanecki." (Am. Compl. ¶ 296.) Similarly, he claims that HAP failed to provide adequate warning in violation of the Michigan Patient Protection Act and the Medicare Act. (Am. Compl. ¶ 313.) Relatedly, Plaintiff says that HAP had a duty to warn Richard Zanecki that Dr. Fessler was not qualified to perform the Wingspan Stent procedure. (Am. Compl. ¶¶ 326, 331.)

Plaintiff also asserts that HAP failed to reasonably select, retain, supervise, or control St. Joseph's Mercy Oakland, University Neurological, and Drs. Muhammad, Fessler, and Whapham in violation of the Michigan Public Health Act and the Medicare Act. (Am. Compl. ¶¶ 298, 300; *see also id.* ¶¶ 330, 418.) Similarly, he claims that HAP failed to properly credential St. Joseph's Mercy Oakland, University Neurological, and Drs. Whapham and Fessler in breach of HAP's contracts with its Medicare providers. (Am. Compl. ¶¶ 331, 336.)

He blames HAP for failing to discover or disclose Drs. Whapham's and Fessler's conflicts of interest. (Am. Compl. ¶¶ 311, 332.)

Plaintiff alleges that HAP engaged in negligent "utilization" review because the average

8

physician on "HAP's Utilization Review Board" or "Quality [I]mprovement [B]oard" would have known that the Wingspan Stent was not a covered HAP benefit for "non Medicare HAP enrolles." (Am. Compl. ¶ 358.)  Relatedly, Plaintiff says that HAP negligently referred Richard Zanecki to University Neurological and Drs. Whapham and Fessler.  (Am. Compl. ¶ 359.)

Plaintiff also claims that Henry Ford Health System entered into an "Assurance Agreement" to comply with human-research standards set forth in the "Belmont Report" and that the agreement was "in essence" a contract between Henry Ford Health System, HAP, and the Department of Health and Human Services.  (Am. Compl. ¶¶ 390-92.)  Plaintiff says that HAP breached this contract and that his father was a third-party beneficiary.  (Am. Compl. ¶¶ 392, 397.)

Perhaps most significantly for the pending motions, Plaintiff says that HAP knew or should have known that the Centers for Medicare & Medicaid Services had issued a National Coverage Decision in November 2006 stating that the Wingspan Stent is not covered by Medicare unless it is part of a clinical trial.  (Am. Compl. ¶¶ 243-44, 317, 423, 424.)  Plaintiff reasons that if HAP had not neglected the National Coverage Decision, it would have informed his father that the procedure was not a Medicare-covered benefit, and Richard Zanecki would have then chosen other treatment. (*See* Am. Compl. ¶¶ 303, 321, 341, 362, 385, 401, 413, 428.)  Relatedly, Plaintiff says that HAP breached its Medicare Advantage contract with CMS by providing "benefits that were Medicare excluded," i.e., the Wingspan Stent.  (Am. Compl. ¶ 408.)

Plaintiff's legal theories are also numerous: corporate negligence, bad faith, negligent per se credentialing, negligent utilization review and referral, negligence per se, breach of contract, negligent supervision, and wrongful death.  (Am. Compl. ¶¶ 290-433.)  These legal theories are rooted in state law.  Perhaps recognizing this, and perhaps because Plaintiff's jurisdictional

allegations are not entirely clear, HAP and the United States have moved to dismiss Plaintiff's Amended Complaint for lack of subject-matter jurisdiction.

## II.

It is well-settled that this Court cannot proceed to the merits of Plaintiff's claims without first establishing that it has subject-matter jurisdiction over those claims. *Am. Telecom Co., L.L.C. v. Republic of Lebanon*, 501 F.3d 534, 538 (6th Cir.2007) ("Subject matter jurisdiction is always a threshold determination."). Where, as here, Defendants have challenged subject-matter jurisdiction, Plaintiff has the burden of proving jurisdiction in order to survive the motion. *Michigan S.R.R. Co. v. Branch & St. Joseph Cntys. Rail Users Ass'n, Inc.*, 287 F.3d 568, 573 (6th Cir. 2002).

A Fed. R. Civ. P. 12(b)(1) motion for lack of subject matter jurisdiction comes in two varieties: a facial challenge, which tests the sufficiency of the pleading, or a factual challenge, which contests the factual basis for jurisdiction. *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen v. First Fed. Savings and Loan Ass'n*, 549 F.2d 884, 890-91 (3d Cir. 1977); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Under a facial challenge, the standards are similar to those that govern a Rule 12(b)(6) motion: the Court accepts as true all the allegations in the complaint, and draws all reasonable inferences in favor of the non-moving party. *See Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325. On the other hand, in a factual attack, the allegations in the complaint are not presumed true, and a district court may look beyond the pleadings and weigh competing evidence to determine whether subject-matter jurisdiction exists. *Id.*; *RMI Titanium Co.*, 78 F.3d at 1134.

Here, neither HAP nor the Government explicitly states whether it is challenging the sufficiency of Plaintiff's allegations or the factual bases underlying them. (*See* HAP's Mot. to

Dismiss at 5-6; Govt.'s Mot. to Dismiss at 3-4.)  Defendants do, however, focus on Plaintiff's allegations, and they do not rely heavily on documents not referenced in the Amended Complaint. More importantly, the Court need not, and does not, examine materials that would be improper when resolving a facial attack.  Accordingly, the Court will treat HAP and the Government's Rule 12(b)(1) motions as a facial attack.

### III.

### A.

One of Defendants' primary arguments is that Plaintiff's claims arise under the Medicare Act.  If Defendants are correct, other bases for subject-matter jurisdiction, including the exclusive jurisdiction provided by the Federal Tort Claims Act, *see* 28 U.S.C. § 1346(b)(1), are statutorily precluded.  *See Livingston Care Ctr., Inc. v. United States*, 934 F.2d 719, 721 (6th Cir. 1991). Accordingly, the Court begins with this issue.

The Secretary of Health and Human Services has created an administrative review process for enrollees to challenge adverse decisions by their Medicare Advantage providers.  42 U.S.C. § 1395w-22(g); 42 C.F.R. § 422.560.  And, as Defendants point out, "[a]side from this administrative review process, the Medicare Act bars judicial review of claims that 'arise under' the Act."  *Giesse v. Sec'y of Dep't of Health & Human Servs.*, 522 F.3d 697, 702 (6th Cir. 2008).  In particular, 42 U.S.C. § 405(h), as made applicable to the Medicare Act by 42 U.S.C. § 1395ii, eliminates other bases for federal-court jurisdiction for claims arising under the Act: "No action against the United States, the [Secretary of Health and Human Services], or any other officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this title." *See also Livingston*, 934 F.2d at 721 ("The plain language of 405(h) . . . precludes the federal courts

11

from entertaining claims based on the jurisdictional provisions of the Federal Tort Claims Act, § 1346 of Title 28, or the statutory grant of jurisdiction over federal questions, § 1331 of Title 28, if the claims 'arise under' the Medicare Act."); *Midland Psychiatric Associates, Inc. v. United States*, 145 F.3d 1000, 1004 (8th Cir. 1998) ("We . . . hold the jurisdictional bar imposed by sentence three of § 405(h) extends to claims based on diversity of citizenship.").  Thus, federal-court review of claims arising under the Medicare Act is available only after an enrollee pursues and completes the administrative review process provided by the Act.  *Giesse*, 522 F.3d at 703-04.

Here, Plaintiff does not contend that he exhausted the administrative review process.  He instead maintains that he did not have to.  Indeed, Plaintiff repeatedly asserts that his claims do not "arise under" the Medicare Act.  (Pl.'s Resp. to Mots. to Dismiss at 5-6.)  For example, he avers: "First Amended Complaint FTCA claims do not arise under [the] Medicare Act," and "This First Amended Complaint does not arise out of the Medicare Act as Defendant United States attempts to fallaciously assert."  (*Id.*)  Although the Court ultimately need not, and does not, decide the issue, Plaintiff's assertions have merit.

A claim arises under the Medicare Act if (1) the "standing and the substantive basis for the presentation of the claims" is the Act, or (2) the claims are "inextricably intertwined" with a claim for Medicare benefits.  *Heckler v. Ringer*, 466 U.S. 602, 614-15 (1984); *accord Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1141 (9th Cir. 2010).  Under this test, courts have found that state law claims seeking consequential damages from a benefits determination "arise under" the Medicare Act.  For example, in *Bodimetric Health Services, Inc. v. Aetna Life & Casualty*, a Medicare intermediary refused to pay certain claims to a Medicare provider, and, as a result, the provider lost $8 million and had to close all of its home health agencies.  903 F.2d 480, 482-83 (7th Cir. 1990).

12

The provider sued the intermediary for, among other things, fraud, fraudulent concealment, negligent misrepresentation, and breach of contractual relationship. *Id.* at 483. Despite the state-law nature of these claims, the Seventh Circuit nonetheless rejected the provider's assertion that its tort claims did not "arise under" the Medicare Act. The court explained: "a party cannot avoid the Medicare Act's jurisdictional bar simply by styling its attack as a claim for collateral damages instead of a challenge to the underlying denial of benefits." *Id.* at 485.

Defendants frame Plaintiff's allegations as contending that Richard Zanecki's death was a consequential damage of HAP's failure to correctly determine whether the Wingspan Stent procedure was a Medicare-covered benefit. Styled this way, this case is similar to *Bodimetric*. *See also DMC-Memphis, Inc. v. Mut. of Omaha Ins. Co.*, 105 F. App'x 671 (6th Cir. 2004).

Still, significant aspects of this case are different. For one, as HAP acknowledges, Plaintiff does not seek to recover Medicare benefits: "Importantly, this complaint is NOT a claim that Zanecki was wrongfully denied payment for a medicare benefit to which he claims an entitlement, nor is it a challenge to the validity of the medicare regulations." (HAP's Mot. to Dismiss at 7; *see also* Pl.'s Resp. to Mots. to Dismiss at 5.) For another, Richard Zanecki's estate seeks to recover for Richard Zanecki's wrongful death caused by HAP's alleged tortious conduct. These two aspects of this case are similar to those that the Ninth Circuit found significant in *Ardary v. Aetna Health Plans of California, Inc.*, 98 F.3d 496, 497 (9th Cir. 1996).

In *Ardary*, Aetna Health Plans had allegedly told Cynthia Ardary that if she enrolled with Aetna's HMO and then needed emergency treatment, she would be airlifted from her rural treatment facility to a larger, more advanced facility. 98 F.3d at 497. Allegedly relying on this promise, Cynthia enrolled with Aetna to obtain her Medicare benefits. *Id.* She later suffered a heart attack

and was taken to a rural hospital lacking both intensive and cardiac care.  *Id.*  Despite repeated requests from Cynthia's Aetna-approved physician, Aetna's HMO administrator refused to authorize the airlift and Cynthia died.  *Id.* at 497-98.  Cynthia's children and husband filed a wrongful-death complaint against Aetna seeking damages pursuant to state law theories including negligence.  *Id.* at 498.  Examining the first test set forth by the Supreme Court in *Heckler*, the Ninth Circuit concluded that "[t]he standing for [the Ardarys'] six claims are state common law theories and not the [Medicare] Act." *Id.* at 499-500.  Turning to the alternate prong of *Heckler*, the court reasoned, "Although the Ardarys concede that their wrongful death complaint is 'predicated on' [the] failure to authorize the airlift transfer, the claims are not 'inextricably intertwined' because the Ardarys are *at bottom* not seeking to recover *benefits*." *Id.* at 500.  The court further stated, "We find nothing in the legislative history to suggest that the Act was designed to abolish all state remedies which might exist against a private Medicare provider for torts committed during its administration of Medicare benefits . . . ." *Id.* at 501.

The Ninth Circuit had reason to revisit *Ardary* in *Kaiser v. Blue Cross of California*, 347 F.3d 1107 (9th Cir. 2003).  There, Community Home Health ("CHH"), a corporation providing home health services to Medicare enrollees, operated under fiscal intermediary Blue Cross.  *Id.* at 1109. CHH claimed that, due to the Secretary's delay in implementing certain Medicare regulations, it received $1 million in overpayments from Blue Cross.  *Id.* at 1110.  Apparently unable to repay the excess, CHH went into bankruptcy.  CHH shareholders and debtors-in-possession, Gary and Verlene Kaiser, sued Blue Cross and the Secretary alleging, among other things, that the Secretary violated the Administrative Procedure Act, that Blue Cross did not negotiate a repayment plan in good faith, and that Blue Cross and the Government breached their contractual obligations to CHH.

14

*Id.* at 1111.  In finding that the Kaisers' claims arose under the Medicare Act, the Ninth Circuit

concluded that *Bodimetric* was "perfectly applicable to the facts in this case." *Id.* at 1114.  And the

court distinguished *Ardary* this way:

> We agree with the Kaisers that a broad reading of *Ardary* could
> weigh in their favor.  Like the plaintiffs in *Ardary*, the Kaisers are
> not, strictly speaking, seeking reimbursement for Medicare services
> and are proceeding under various statutory and common law theories.
> The Ardarys suffered a death because of the alleged torts committed
> by Aetna; the Kaisers suffered the loss of their business and personal
> bankruptcy because of alleged wrongs committed by Blue Cross and
> the HCFA.  We find, however, far more differences distinguishing
> the two claims.  We characterized the question in *Ardary* as follows:
>
>> [D]oes the Medicare Act, which provides for
>> exclusive administrative review of all claims "arising
>> under" that Act, apply to preclude the heirs of a
>> deceased Medicare beneficiary from bringing state
>> law claims for wrongful death against a private
>> Medicare provider when those claims do not seek
>> recovery of Medicare benefits but instead seek
>> compensatory and punitive damages on the grounds
>> that the provider both improperly denied emergency
>> medical services and misrepresented its managed care
>> plan to the beneficiary?
>
> *Ardary,* 98 F.3d at 499. Consistent with the above articulation of the
> issue, *Ardary* focused on claims "against a private Medicare provider
> for torts committed during its administration of Medicare benefits"
> and the "rights of patients." *Id.* at 501. Indeed, the *Ardary* analysis
> convinces us that its holding does not extend beyond patients and
> torts committed in the sale or provision of medical services. For
> example, the *Ardary* court found no cases "directly addressing the
> question raised" in the case, *id.* at 499 n. 8, and expressly
> distinguished cases such as [*Bodimetric*], as being inapplicable
> because of factual differences, *Ardary,* 98 F.3d at 501.

*Kaiser*, 347 F.3d at 1113.

Even with the narrow reading of *Ardary* provided in *Kaiser*, this Court has reservations about

concluding that all of Plaintiff's claims arise under the Medicare Act.  Richard Zanecki's estate

15

asserts that if HAP had not negligently authorized the Wingspan Stent procedure, Richard Zanecki would not have suffered personal injury. Plaintiff therefore alleges a "tort[] committed [against a patient] in the . . . provision of medical services." *Kaiser*, 347 F.3d at 1113. Further, it appears that the administrative procedures provided by the Medicare Act were not intended to resolve the types of claims that Plaintiff raises in this case. Neither Plaintiff's claim that HAP failed to reasonably select, retain, supervise, or control St. Joseph's Mercy Oakland, University Neurological, and Drs. Muhammad, Fessler, and Whapham in violation of the Medicare Act, nor his claim that HAP failed to provide adequate warning about the risks of the Wingspan Stent procedure, depend on any benefit determination. *See United States v. Blue Cross & Blue Shield of Alabama, Inc.*, 156 F.3d 1098, 1109 (11th Cir. 1998) ("The Supreme Court has not sought . . . to extend the reach of subsection 405(h) to bar claims that, although they may implicate benefits determinations, are certainly not veiled claims for benefits by a disgruntled beneficiary that could have, and should have, been pursued administratively in the first instance.").

In short, there is good reason for this Court to assume, still without deciding, that Plaintiff's claims do not "arise under" the Medicare Act as those words are used in 42 U.S.C. § 405(h).

## B.

Even under the assumption that 42 U.S.C. § 405(h) does not preclude diversity, federal question, or Federal Tort Claims Act jurisdiction, it remains Plaintiff's burden to adequately plead that one of these, or some other, basis for subject-matter jurisdiction exists in this case.

Plaintiff has not argued, and his Amended Complaint does not plead, that complete diversity exists in this case. Indeed, while not stating his father's domicile, Plaintiff pleads that Richard Zanecki was a "resident" of Michigan. (Am Compl. ¶ 31.); 28 U.S.C. § 1332(c)(2) ("For the

16

purposes of this section . . . the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent.").  And he asserts that HAP is a Michigan corporation.  (Am. Compl. ¶ 17.); 28 U.S.C. § 1332(c)(1).  Accordingly, the Amended Complaint strongly suggests the lack of complete diversity; at a minimum, Plaintiff has not adequately pled that requirement of 28 U.S.C. § 1332.

Given that all of Plaintiff's counts are rooted in state law, his allegations regarding federal-question jurisdiction do only a little better.  *See Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006) (describing the category of claims that arise under federal law for purposes of 28 U.S.C. § 1331 where federal law does not create the cause of action to be "special and small"); *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (7th Cir. 2007) (discussing the limited circumstances where a state-law claim is considered to arise under federal law because federal law is an "essential element" of the state-law claim).  Further, Plaintiff has apparently abandoned 28 U.S.C. § 1331 as a basis for subject-matter jurisdiction.  In his response to Defendants' motions that call subject-matter jurisdiction into doubt, Plaintiff does not assert jurisdiction under § 1331.  Instead he makes clear that his claims are all pursuant to the Federal Tort Claims Act.  (Pl.'s Resp. to Mots. to Dismiss at 5-7; *see also* Am. Compl. ¶ 1 ("This action arises pursuant to the (FTCA) Federal Tort Claims Act 28 U.S.C. § 2671-2680, et seq.").)  He asserts that "this Court has exclusive juri[s]diction over Plaintiff's FTCA based First Amended Complaint alleging state torts by HAP under FTCA."  (Pl.'s Resp. to Mots. to Dismiss at 5 (capitalization altered).)  Plaintiff also declares, "Instant complaint is an FTCA complaint."  (*Id.* at 5-6.)  And he provides that "HAP as Medicare contractor is a federal employee for FTCA purposes as this First Amended Complaint is not subject to 405(h)."  (*Id.* at 6.)  Accordingly, this Court understands Plaintiff to argue that his basis for subject-matter jurisdiction

is the Federal Tort Claims Act.  The Court now turns to that statute.

## C.

Beginning with Defendant United States, it is well-established that the United States is entitled sovereign immunity and therefore may not be sued without its consent.  *Stocker v. United States*, 705 F.3d 225, 230 (6th Cir. 2013).  And "the terms of this consent define the jurisdiction of the courts to entertain a suit against the Government." *Id.*; *see also Flechsig v. United States*, 991 F.2d 300, 302 (6th Cir. 1993).  Pursuant to the Federal Tort Claims Act ("FTCA"), the Government has consented to be sued

> for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any *employee of the Government* while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added).  The term "employee of the Government" includes "officers or employees of any federal agency."  In turn, "federal agency" encompasses "corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States*."  28 U.S.C. § 2671 (emphasis added).

In distinguishing "instrumentalities" and "agencies" from "contractor[s]," courts consider the power of the Government to "control the detailed physical performance of the contractor," *Logue v. United States*, 412 U.S. 521, 527-28 (1973), and, similarly, whether the United States has the right to supervise the "day-to-day operations" of the contractor, *U. S. v. Orleans*, 425 U.S. 807, 813-14 (1976).  *See also B & A Marine Co., Inc. v. Am. Foreign Shipping Co., Inc.*, 23 F.3d 709, 713 (2d Cir. 1994); *Hsieh v. Consol. Eng'g Servs., Inc.*, 569 F. Supp. 2d 159, 176 (D.D.C. 2008).  The fact that the Government sets specific conditions to implement federal objectives, reserves the right to

18

inspect the contractor's work, and monitors the contractor's compliance with federal law does not "vitiat[e] the independent contractor exception."  *Hsieh*, 569 F. Supp. 2d at 176-77; *see also Orleans*, 425 U.S. at 815 ("Thus, . . . the question . . . is not is not whether the [contractor] receives federal money and must comply with federal standards and regulations, but whether its daily operations are supervised by the Federal Government."); *Gibbons v. Fronton*, 533 F. Supp. 2d 449, 453 (S.D.N.Y. 2008) ("A contractor is considered to be an employee only if the government agency manages the details of the contractor's work or supervises him in his daily duties."  (internal quotation marks, alterations, and citation omitted)); *Hentnik v. United States*, No. 02-9498, 2003 WL 22928648, at *4 (S.D.N.Y. Dec. 10, 2003) ("Where the Government has no contractual right to control the contractors' physical performance or supervise its day-to-day operations, but instead reserves the right to inspect the contractors' performance only to ensure compliance with the terms of the contract, the Government cannot be held liable for the acts of its independent contractors."). Further, "courts routinely hold that the United States cannot be sued where the alleged duty of care has been delegated to an independent contractor."  *Hsieh*, 569 F. Supp. 2d at 176-77.

Here, Plaintiff alleges that HAP is an "instrumentalit[y]" or "agen[t]" of CMS because HAP makes Medicare benefit determinations pursuant to its Medicare Advantage contract with CMS. (Am. Compl. ¶¶ 190-95, 221-22, 232; *see also* Pl.'s Resp. to Mots. to Dismiss at 2.)  For example, Plaintiff claims that, "[f]or out-of-network or affiliate providers, HAP is a Medicare [f]iscal intermediary as well as Medicare carrier."  (Am. Compl. ¶ 193.)  He also says, "HAP is not an independent contractor under [the] FTCA for the purposes of organizational (agency) benefit determinations under [the] Medicare Act – Part C Medicare Advantage as the Secretary of Health and Human Services controls or has the right to control [HAP's] determinations under [the]

19

Medicare Act as initiated by [a] beneficiary."  (Am. Compl. ¶ 194.)

None of the parties could identify a single case in which a private insurance company acting as a Medicare Advantage Organization was found to be an agent or instrumentality of the federal government under the FTCA, and the Court's own research did not reveal any.  Based on the relationship between Medicare Advantage Organizations and CMS, as gleaned from statutes, regulations, and case law describing this relationship, Plaintiff's allegations about HAP's authority to make Medicare benefit determinations do not suffice to carry his burden of establishing subject-matter jurisdiction.

As noted at the outset, Medicare Advantage Organizations are not reimbursed for the specific care given by one of its Medicare providers; instead, these organizations receive a fixed, monthly payment from CMS.  Specifically, each year, an MAO must submit to CMS an aggregate monthly bid amount for each Medicare Advantage plan the organization intends to offer in the upcoming year.  20 C.F.R. § 422.254(a)(1) (Oct. 1, 2006).  The aggregate monthly bid amount is the MAO's estimate of the average monthly revenue it needs to provide the following benefits to a Medicare Advantage eligible beneficiary with a "nationally average risk profile": (1) the "benefits under the original Medicare fee-for service program," (2) "basic prescription drug coverage, if any," and (3) "supplemental health care benefits, if any."  20 C.F.R. § 422.254(b)(1).  Once submitted, CMS has the responsibility of reviewing, negotiating, and approving the MAO's bid.  20 C.F.R. §  422.256. If CMS approves the bid, CMS pays the MAO one of two amounts on a monthly basis.  For plans with a monthly aggregate bid amount less than a "benchmark" amount for covering original Medicare benefits, *see* 20 C.F.R. § 422.258, CMS pays the MAO the organization's estimate of its monthly required revenue to provide original Medicare benefits to a beneficiary with an average risk

profile, *see* 20 C.F.R. § 422.304(a)(1).  For plans that have a bid amount greater than or equal to the

benchmark, CMS pays "the county capitation rate CMS publishes annually" (or for plans serving

multiple counties, "the weighted average of county rates in a plan's service area").  *See* 20 C.F.R.

§ 422.304(a)(2).

It is thus apparent that Medicare Advantage Organizations receive one of two *fixed* monthly

payments from CMS.  This in turn means that it is the Medicare Advantage Organization—not

CMS—that bears the risk of approving a procedure that is not covered by Medicare.  Other courts

have reached the same conclusion.  *Meek-Horton v. Trover Solutions, Inc.*, No. 11-6054, 2013 WL

25888, at *2 (S.D.N.Y. Jan. 2, 2013) ("MAOs are paid a set monthly reimbursement rate based on

a formula established by the Center for Medicare and Medicaid Services . . . ."); *Potts v. Rawlings*

*Co., LLC*, 897 F. Supp. 2d 185, 189 (S.D.N.Y. 2012) ("Under these contracts, CMS pays an MA

organization a fixed amount for each enrollee, per capita . . . ."); *Main & Assocs., Inc. v. Blue Cross*

*& Blue Shield of Ala.*, 776 F. Supp. 2d 1270, 1273 (M.D. Ala. 2011) ("When Medicare recipients

enroll in [Blue Cross and Blue Shield of Alabama's Medicare Advantage plan], Medicare no longer

pays providers of covered services directly when the recipients receive covered medical treatment.

Medicare pays [Blue Cross and Blue Shield of Alabama] a set monthly fee called a capitation rate

to administer and manage the enrollee's healthcare insurance."); *see also* (Am. Compl. ¶ 225 ("CMS

pays an MAO a fixed amount for each enrollee, per capita.").)

Given CMS's contractual relationship with Medicare Advantage Organizations such as HAP,

it is difficult to see how an erroneous decision by HAP about whether a procedure is covered by

Medicare would be attributable to CMS.  If the MAO pays for a procedure not covered by

Medicare—for example, Richard Zanecki's Wingspan Stent procedure—it bears the risk of not

21

recouping the costs of the procedure through its fixed monthly payments from CMS.  On the other hand, if the MAO refuses to pay for a procedure covered by Medicare, it bears the risk of an enrollee challenging its decision through an administrative process created by the Secretary, which, ultimately could include an appeal to federal court.  *See Giesse v. Sec'y of Dep't of Health & Human Servs.*, 522 F.3d 697, 703-04 (6th Cir. 2008).  Further, MAO performance is monitored by CMS, and CMS may terminate or decline to renew an MAO's contract for various reasons, including that the MAO committed false, fraudulent, or abusive activities, failed to comply with the prompt payment requirements set forth by the regulations, or failed to provide for services as set forth in 20 C.F.R. § 422.112.  *See* 42 C.F.R. § 422.502(b),(d) (evaluation of MAO applications), § 422.510 (termination of MAO contracts), § 422.750-60 (authority to sanction MAO).  Although perhaps by inadvertence, Plaintiff himself pleads that "[a]n MA plan assumes full responsibility for paying the medical costs of its plan participants in exchange for a fixed annual per participant payment from the government."  (*See* Am. Compl. ¶ 226.)

Aside from HAP's Medicare benefit determinations, Plaintiff's Amended Complaint does not allege how CMS controls, or has the authority to control, the "detailed physical performance" or the "day-to-day operations" of HAP.  *See Logue*, 412 U.S. at 527-28; *Orleans*, 425 U.S. at 813-14.  It is true that HAP must comply with the regulations governing MAOs.  And HAP does receive payments from CMS.  And an enrollee may appeal HAP's adverse benefit decisions through an administrative process created by the Secretary.  But these facts do not demonstrate that CMS has the type of control over HAP's daily operations that justifies "vitiating the independent contractor exception," *Hsieh*, 569 F. Supp. 2d at 176-77.  *See Orleans*, 425 U.S. at 815; *Gibbons*, 533 F. Supp. 2d at 453.

22

In sum then, taking as true the non-conclusory allegations of the Amended Complaint, Plaintiff has not adequately pled how HAP's status as a Medicare Advantage Organization justifies finding that HAP is an instrumentality or agency of CMS.  Plaintiff has therefore not carried his burden of showing that the United States has waived its sovereign immunity pursuant to the FTCA.  But, according to Plaintiff, this is the sole jurisdictional basis for his Amended Complaint.  (Pl.'s Resp. to Mots. for Summ. J. at 5-7.)  Dismissal of Defendant United States for lack of subject-matter jurisdiction is therefore warranted.

## D.

The cases cited by Plaintiff, and still others reviewed by the Court, do not require a different result.

## 1.

The Court acknowledges that Medicare Part A fiscal intermediaries and Medicare Part B carriers have been held to be "officer[s] or employee[s]" of the United States as those terms are used in 42 U.S.C. § 405(h).  *Bodimetric*, 903 F.2d at 487-88 ("Congress intended for private organizations (and specifically fiscal intermediaries) to play a 'considerable role' in the Medicare reimbursement program. . . .  If dissatisfied claimants could avoid the preclusive effect of section 405(h) by simply bringing suit against the fiscal intermediary instead of the Secretary, the Medicare Act's goals of efficiency and finality would be substantially undermined."); *Midland Psychiatric Associates, Inc. v. United States*, 969 F. Supp. 543, 548 (W.D. Mo. 1997) ("Given the Medicare Act's structure and the integral role played by intermediaries, it is only logical to include them within the ambit of the . . . protection [provided by the third sentence of § 405(h)]."), *aff'd*, 145 F.3d 1000, 1003 (8th Cir. 1998) (affirming district court's finding that carrier was an "officer or employee" within the

meaning of § 405(h): "The *Bodimetric* court held that in their role as fiscal intermediaries, private organizations serve as federal officers or employees. . . . This conclusion holds good for Medicare carriers as well.  Carriers are governmental agents.").  But Plaintiff is adamant that his claims do not arise under 42 U.S.C. § 405(h), and, as discussed in Part III.A., Plaintiff is likely correct on that point.  More importantly, § 405(h) contains no language comparable to the FTCA's contractor carve-out, which is the language in question in this case.  Thus, granting that intermediaries and carriers are "officer[s] or employee[s]" within the meaning of 42 U.S.C. § 405(h) does not affect the Court's conclusion that Plaintiff has not adequately pled that a Medicare Advantage Organization is an "instrumentalit[y]" or "agen[t]" within the meaning of the FTCA.

## 2.

It is also true that courts have found that Medicare Part A fiscal intermediaries and Medicare Part B carriers are entitled to sovereign immunity.  *Anderson v. Occidental Life Ins. Co. of California*, 727 F.2d 855, 856 (9th Cir. 1984); *Matranga v. Travelers Ins. Co.*, 563 F.2d 677 (5th Cir. 1977); *cf. Bushman v. Seiler*, 755 F.2d 653, 655 (8th Cir. 1985) (official immunity); *Midland Psychiatric Associates, Inc. v. United States*, 145 F.3d 1000, 1005 (8th Cir. 1998) (citing *Bushman* and noting "we have held Medicare carriers are governmental agents for purposes of official immunity.").  Although none of *Anderson*, *Matranga*, or *Bushman* involved the FTCA, the Court recognizes that there could be tension in concluding that, on the one hand, fiscal intermediaries and carriers are entitled to sovereign immunity, but, on the other hand, are not "instrumentalities" or "agencies" subject to the FTCA's waiver of that immunity.  *Cf. Roberts v. Hay*, No. 92-AR-0212-M, 1992 WL 206292 (N.D. Ala. June 9, 1992) ("The still-ongoing debate over whether a Medicare fiscal intermediary like Blue Cross ought to be considered as a governmental agent for the purposes

24

of sovereign immunity is a complex and fascinating one involving important issues of public policy . . . ."). But nothing that this Court has concluded has any effect on this potential peculiarity. This is because this case involves a Part C Medicare Advantage Organization, and these organizations have a contractual relationship with CMS that materially differs from those of intermediaries and carriers.

As noted at the outset, intermediaries and carriers are responsible for reviewing a Medicare provider's claim on behalf of the Secretary, determining whether payment is proper, and, if so, making the payment using the Secretary's funds. *See New England Deaconess Hosp. v. Sebelius*, No. 09-1787 BAH, 2013 WL 1791029, at *2 (D.D.C. Apr. 29, 2013) ("Providers submit claims . . . for reimbursement to a series of private 'Medicare administrative contractors' (also known as 'fiscal intermediaries'), who, among other functions, process claims and reimburse providers on behalf of Medicare. If a provider disagrees with a fiscal intermediary's reimbursement decision, the provider may appeal the decision to the Provider Reimbursement Review Board ("PRRB"). At her discretion, the Secretary may reverse, affirm, or modify any PRRB decision." (citations omitted)); *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 16 (D.D.C. 2011) ("CMS, through a fiscal intermediary or Medicare Administrative Contractor ('Intermediary'), pays hospitals participating in the Medicare program. A hospital's claimed costs for services furnished to Medicare beneficiaries are reviewed and subject to audit by the Intermediary acting as an agent of the Secretary." (citations omitted)).

The courts in *Anderson*, *Matranga*, and *Bushman* recognized that intermediaries and carriers administer Medicare payments on behalf of the Secretary. Indeed, in *Matranga*, the court relied in significant part on a section of the Code of Federal Regulations that then provided:

25

> With respect to the performance of functions involving payments for services of physicians, the Secretary shall, to the extent possible, enter into such contracts with carriers.  In the performance of their contractual undertakings, *the carriers act on behalf of the Secretary*, carrying on for him the administrative responsibilities imposed by the law.  *The Secretary, however, is the real party in interest in the administration of the program* and will endeavor to safeguard the interests of his contractual representatives with respect to their actions in the fulfillment of commitments under the contracts entered into by them with the Secretary.

20 C.F.R. § 405.670 (1977) (emphases added); *see also Peterson v. Weinberger*, 508 F.2d 45, 55 n.7 (5th Cir. 1975) (relying on earlier version of the same regulation); *Peterson v. Blue Cross/Blue Shield of Texas,* 508 F.2d 55, 58 (5th Cir. 1975) (citing *Peterson v. Weinberger* for the proposition that "Medicare fiscal intermediaries, acting pursuant to a contract with the government" are "under the sovereign immunity umbrella").  The court in *Anderson*, in addition to relying on *Matranga*, noted the Secretary was contractually obligated to indemnify the Medicare carrier. 727 F.2d at 856.  It then reasoned as follows: "The United States is the real party in interest in actions against Medicare carriers because recovery would come from the federal treasury.  Accordingly, the United States cannot be sued without its consent."  *Id.*  And in holding that a consultant to a carrier was entitled to official immunity, the court in *Bushman* cited both *Anderson* and *Matranga* for the proposition that it was "well settled that Medicare intermediaries and carriers can be governmental agents for immunity purposes."  755 F.2d at 655.

Plaintiff has not pointed to any regulation providing that a Part C Medicare Advantage Organization "act[s] on behalf of the Secretary" and that CMS remains "the real party in interest" when it grants an MAO the contractual right to provide Medicare benefits.  And this is likely because, as discussed, MAOs, unlike intermediaries or carriers, do not control the Secretary's purse strings.  As well-stated by the Fifth Circuit Court of Appeals in discussing the predecessor entities

26

to Medicare Advantage Organizations:

> One important difference in the administration of Part C, as opposed to Parts A and B, of the Medicare Act is the financial risk borne by the administering entity. Under Parts A and B, funds from the Federal Supplementary Medical Insurance Trust Fund are paid directly to providers for each qualifying service provided to a beneficiary. *See* 42 U.S.C. §§ 1395f(b), 1395g(a), 1395*l*(a). The funds may be paid by intermediaries or carriers contracted by CMS to process claims and disburse federal funds. *See* 42 U.S.C. §§ 1395h(a), 1395u(a). Under Part C, however, CMS pays [Medicare+Choice] organizations fixed monthly payments in advance, regardless of the value of the services actually provided to the M+C beneficiaries. *See* 42 U.S.C. § 1395w-23(a). In return, the M+C organization assumes responsibility and full financial risk for providing and arranging healthcare services for M+C beneficiaries, 42 U.S.C. § 1395w-25(b); 42 C.F.R § 422.100(a), sometimes contracting health care providers to furnish medical services to those beneficiaries, *see* 42 U.S.C. § 1395w-25(b)(4). Such contracts between M+C organizations and providers are subject to very few restrictions, *see, e.g.,* 42 C.F.R. § 422.520(b) (requiring contracts between M+C organizations and providers to contain a prompt payment provision); generally, the parties may negotiate their own terms. Thus, under Part C, the government transfers the risk of providing care for M+C enrollees to the M+C organization.

*RenCare, Ltd. v. Humana Health Plan of Texas, Inc.*, 395 F.3d 555, 558-59 (5th Cir. 2004).

This Court therefore finds that even if intermediaries and carriers should be considered "instrumentalities" or "agencies" within the meaning of the FTCA, there is good reason for treating Medicare Advantage Organizations differently. Therefore, none of *Anderson*, *Matranga*, or *Bushman* upset this Court's conclusion that Plaintiff has not adequately pled that HAP is an "instrumentalit[y]" or "agen[t]" under the FTCA.

**3.**

Plaintiff also cites *Grijalva v. Shalala*, 152 F.3d 1115 (9th Cir. 1998) in support of his claim that HAP, as a Medicare Advantage Organization, is an instrumentality or agent under the FTCA.

27

(*See* Am. Compl. ¶ 222.)

At the time *Grijalva* was decided, Congress had, under what was then Part C of the Medicare program, "authorized the Secretary to enter into 'risk-sharing' contracts with health maintenance organizations." *Id.* at 1117 (citing 42 U.S.C. § 1395mm); *see also Minnesota ex rel. Hatch v. United States*, 102 F. Supp. 2d 1115, 1116 (D. Minn. 2000) (providing a history of Medicare Part C). Similar to Medicare Advantage Organizations, under these risk-sharing contracts, HMOs provided Medicare beneficiaries "all the Medicare services provided in the statute, in exchange for a monthly flat payment from the Secretary." *Grijalva*, 152 F.3d at 1117 (citing 42 U.S.C. § 1395mm(a), (c)).

In *Grijalva*, Medicare beneficiaries sued Arizona HMOs under contract with the Secretary to provide Medicare benefits; the enrollees claimed that the HMOs denied benefits without providing constitutionally guaranteed due process. *Id.* at 1118-19. Noting that "actions of private parties are not subject to the requirements of constitutional due process unless they can fairly be considered government action," *id.* at 1119, the Ninth Circuit concluded that "HMOs and the federal government are essentially engaged as joint participants to provide Medicare services such that the actions of HMOs in denying medical services to Medicare beneficiaries and in failing to provide adequate notice may fairly be attributed to the federal government," *id.* at 1120. The Court explained that (1) the "Secretary extensively regulates the provision of Medicare services by HMOs,"(2) the "Secretary pays HMOs for each enrolled Medicare beneficiary (regardless of the services provided)," (3) the "federal government has created the legal framework—the standards and enforcement mechanisms—within which HMOs make adverse determinations, issue notices, and guarantee appeal rights," and (4) "Medicare beneficiaries enrolled in HMOs may appeal an HMO's adverse determination to the Secretary, who has the power to overturn the HMO's decision."

*Id.* at 1120.  The Court concluded, "[e]ach of these factors alone might not be sufficient to establish federal action.  Together they show federal action."  *Id.* at 1120.

While the factors found to support federal action in *Grijalva* suggest that Medicare Advantage Organizations could be instrumentalities or agencies within the meaning of the FTCA, it is notable that in applying the control test set out by the Supreme Court, courts have reasoned that similar factors—the Government's setting specific conditions to implement federal objectives, reserving the right to inspect the contractor's work, and monitoring the contractor's compliance with federal law—do not "vitiat[e] the [FTCA's] independent contractor exception."  *Hsieh*, 569 F. Supp. 2d at 176-77.  *Grijalva* did not involve the FTCA, and it is unclear how the court would have harmonized its state-action finding with the "contractor" language of that statute.

There are additional reasons that *Grijalva* does not require the Court to deviate from its conclusion that it lacks subject-matter jurisdiction over Plaintiff's claims against the United States.  The Ninth Circuit did not address this Court's key rationale: when a Medicare Advantage Organization makes a benefit decision, it, rather than CMS, bears the risk of making a mistake.  Additionally, *Grijalva* is not binding on this Court and its persuasive value is minimal given that, in *Shalala v. Grijalva*, 526 U.S. 1096 (1999), the Supreme Court vacated the decision in view of *American Manufacturers Insurance Company v. Sullivan*, 526 U.S. 40 (1999) and the 1997 revisions to Medicare Part C.  *See Lebron v. Wilkins*, 820 F. Supp. 2d 1273, 1289 n.7 (M.D. Fla. 2011) (noting that vacated decisions have "no precedential value").  Notably, in *Sullivan*, the Supreme Court held that private insurers that provided benefits to employees under Pennsylvania's workers' compensation scheme did not engage in state action when they refused to pay for an employee's medical care pending a determination by a third-party adjudicator that the sought-after benefits were

"necessary" and "reasonable."   526 U.S. at 45-48.

Thus, while *Grijalva* provides limited support for Plaintiff's claim that HAP was an instrumentality or agent within the meaning of the FTCA, it certainly does not require this Court to reach that conclusion.

## E.

As for HAP, it is not a proper defendant to a Federal Tort Claims Act claim.  Rather, the United States is the only proper defendant of such claims.  28 U.S.C. § 2679(a); *Smith v. United States*, 561 F.3d 1090, 1099 (10th Cir. 2009); *Jackson v. Kotter*, 541 F.3d 688, 693 (7th Cir. 2008); *Allgeier v. United States*, 909 F.2d 869, 871 (6th Cir. 1990).

Further, as already discussed, Plaintiff has not pled or argued that HAP and Richard Zanecki are diverse.  *See* 28 U.S.C. § 1332.  And Plaintiff has not adequately shown how his state law claims arise under federal law.  *See Bennett*, 484 F.3d at 910.

Finally, to the extent that Plaintiff has brought state-law claims against HAP, the Court should decline to exercise supplemental jurisdiction over those claims.  *Musson Theatrical, Inc. v. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims[.]"); *see also Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 849 (6th Cir. 2010) ("As [plaintiff's] one federal claim was properly dismissed, it was likewise proper for the district court to decline to exercise supplemental jurisdiction over the remaining state law claims."); *Ketola v. Clearwater*, No. 08-31, 2008 U.S. Dist. LEXIS 104205, at *13-14 (W.D. Mich. Oct. 31, 2008) ("Where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the state-law claims should be dismissed without

reaching their merits.").

**IV.**

For the foregoing reasons, this Court concludes that Plaintiff has brought this suit pursuant to the Federal Tort Claims Act, that HAP is not a proper defendant to such an action, and Plaintiff has not sufficiently pled that HAP is an "employee of the Government" such that the United States would be subject to suit under the FTCA. Accordingly, this Court RECOMMENDS that Plaintiff's Amended Complaint be DISMISSED for lack of subject-matter jurisdiction. It follows from this recommendation, and from the fact that Plaintiff is now represented by counsel, that HAP's Motion to Preclude Mark Zanecki from Engaging in the Unauthorized Practice of Law (Dkt. 48) should be DENIED AS MOOT.

**V.**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an

31

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

S/Laurie J. Michelson
Laurie J. Michelson
United States Magistrate Judge

Dated: May 20, 2013

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on May 20, 2013.

s/Jane Johnson
Case Manager to
Magistrate Judge Laurie J. Michelson